Case number 20-1286 et al. Wabash Valley Power Association, Inc. Petitioner v. Federal Energy Regulatory Commission. Mr. Elliott for the petitioner, Ms. Pasella for the respondent. Thank you. Mr. Elliott, good morning. Good morning. Please proceed. Thank you. May it please the Court, this petition concerns FERC's flawed interpretation and application of the Supreme Court's Mobile Sierra Doctrine. The Court's review of FERC's interpretation of the Mobile Sierra Doctrine is de novo. FERC's orders do not explain why the rate and the rate is not protected under Mobile Sierra. Here's a question I have for you, counsel. I was trying to understand why this structure would be set up, whereby there's a board of directors really dominated by the distributors, and that if I understand correctly, the distributors actually own Wabash. Is that correct? That is correct. So what we have in this case is the distributors are paying themselves. In effect, yes. And if they're paying themselves, how can it be argued that there is equal bargaining power? Isn't that meaningless? No, it is not. I mean, there are 20... In other words, this distributor, in some respects, has an interest in having a high rate because it's going to get the benefit back on that. So how can, even if Mobile Sierra applies, how can you be saying there's equal bargaining power when in fact the distributors are on both sides of the transaction? Well, there are 20 bilateral contracts between each member owner and Wabash Valley. And you are correct, the distributors own Wabash Valley. So they are on both sides of the transaction? No, not in the sense of... In economic reality. The contracts are not arm's length deals because each of the 20 distribution co-ops is a separate corporate entity with its own interest. They have a common interest in... Am I not correct on my proposition that the distributors are on both sides of the transaction? As a matter of corporate law, that is not entirely correct because Wabash... In economic terms. In economic terms, they have a common interest in Wabash Valley procuring the lowest cost rates. And they have a cost of service... They also have a common interest in having Wabash get a high rate. No. They get the economic benefits from that. Well, it would be a complete wash. I mean, Wabash Valley is a non-profit. It passes through its costs to the 20 member owners. So Wabash Valley either bills generation or it purchases wholesale power in the wholesale power market on behalf of the 20 members and then passes through the costs that it incurs to these 20 members under their long-term contracts and the formulary rate tariff. So it has a complete pass-through entity. So the 20 members have an interest in Wabash Valley holding down their costs and making the rates to them as low as possible because it's a non-profit. Perhaps, but they also get the benefit if the rates are higher. Well, there's... So they are... Yeah. I mean, there's a flavor in some of FERC's orders, particularly the orders involving RTO transmission owners in which they have a common interest as transmission owners joining an RTO in excluding other competitors. And FERC likened that to a lack of arm's length bargaining to entities that were merging or entities that were corporate affiliates. But that's simply not the case with these co-ops. They don't have that kind of common interest. They're not trying to exclude other competitors and they have no interest in Wabash Valley increasing the rates to them because the distribution co-ops themselves are non-profit entities and they have to pass through whatever costs they incur to their end-use consumers that costs down. Counsel, when a judge tries to ask a question, you're supposed to pause. I apologize and I know better. I'm sorry. All right. All right. Now, with respect to the two members who did not wish, Titmont and the other one who did not wish to agree. Yes. How much bargaining power do they have? They have equal bargaining power with the other members. Well, once the majority has voted against them, what bargaining power do they have? Well, they've agreed in their contracts and in the bylaws of Wabash Valley to the democratic organization and governance of Wabash Valley. But isn't it fair to say they had very little bargaining power at this point? Once the majority have voted against them to adopt the public interest standard. Well, let me clarify the record. I don't think either of the two, we don't know why the two co-ops who did not sign these contracts did not sign them. They have the same bargaining power as any other owner. But they may have very small bargaining power relative to the joint venture, the corporate entity, right? This is true. Which makes this case arguably different from a classic mobile Sierra where you have the large, you have equally powerful entities on both sides of the wholesale power transaction. It is unique in that the distribution cooperatives are both the wholesale customers and the member owners of the TNT. It's different, right? The owner seems very small relative to the joint venture, which to me is a fact that cuts against you. On the other hand, the fact that this is a joint venture and Judge Silberman's point about being on both sides of the transaction, I had thought that sort of cuts in your favor because you might think that these are, this is a group of people just making arrangements among themselves rather than unilaterally imposing tariffs on economically separate entities. But it just seems to me it's different from the classic mobile Sierra, one-on-one large wholesale entities. You are exactly right. And I think that is our point, that it is a multilateral deal involving multi-parties long-term and they want to protect it from being attacked either by a one disaffected member or by an outside entity or by the commission itself. And that's the very purpose of mobile Sierra is to protect a long-term contractual arrangement. If it's different in that way, why wouldn't we give FERC a measure of deference in assessing whether this is the kind of transaction likely to produce a just and reasonable rate, either because of the economic power or the ownership relationship? Well, I believe the problem and as a matter, you are correct. They would get some deference in applying the facts to the law. And in this case, we think they have misstated the law. And we've explained that in our brief where they've added additional restrictions on mobile Sierra that are not in the case law. And they haven't really explained why the facts, which seem to be undisputed here, lead to the result that to reject the application of mobile Sierra to this. For the reason, the policy reason that you gave that this is exactly the kind of thing that should be protected. Mr. Elliott, one of the things that I think it's important to clarify, I mean, I think some of this discussion goes to whether mobile Sierra should apply to the new contracts themselves, as opposed to whether that standard should apply to the types of changes that are mentioned in section 22. And so I guess I have a couple of questions about that section. So section 22, the briefing focuses a lot on the second clause of that, that there could be a unilateral change to the tariffs. But I guess I'm not sure I understand how the second clause fits with the first clause. So the first clause suggests that there can be no unilateral changes. And then the second clause says, well, if notwithstanding the foregoing provision, a modification is made unilaterally, then we apply the mobile Sierra presumption. So I guess if you could just explain to me what is, how does section 22 work? Yes, it is a classic among utility lawyers, mobile Sierra clause. The first clause waives the rights of the utility of any of the parties, I'm sorry, to unilaterally file a new rate or to file a complaint under the ordinary, just and reasonable standard to effect a rate change. So it's bilateral waiver of rights under the ordinary mobile Sierra clause, sorry, the ordinary, just and reasonable standard, if you will. That is, that's basically what mobile and Sierra allow. You can, parties can bilaterally waive their rights to change the rates. And so that's the first clause. The second clause is, if you will, a clarification that if a, any party nonetheless attempts to file a complaint, it's governed by the public interest standard. And that's because the courts have held that you cannot waive that public interest, the ability of a party to complain under the public interest standard. So that's non-waivable. So the first part waives everything to the maximum extent possible. The second clause explains that where it cannot be waived, the public interest standard applies. So how does that second clause then interact with the cases, which suggests that mobile Sierra doesn't apply to contracts that indicate there could be a unilateral change to the rates? Like the second clause suggests there can be unilateral changes. Yeah. That means the presumption doesn't apply. Right. There are so-called Memphis clause would be a, is an example of that. That would be a contract that says we agree to pay, you know, for 10 years, we'll buy power from you at whatever rate is then you filed and is approved by FERC. And that would be a waiver of the right to a fixed rate by the purchaser and the seller. And it would preserve the seller's right to unilaterally replace the rate at any point. It would also preserve the buyer's right to unilaterally say this rate is too high and needs to be replaced at any point. So it would essentially remove the contract from the protections of mobile Sierra. And so that's one of the beauties of mobile Sierra is it allows the parties to devise in their contract, what protections they want and do not want. And that flexibility, whether it's to agree to a stated rate that's fixed for a long time or to a formula that is a formula that's agreed upon, but who's, you know, the input values would vary from year to year, which is what Wabash Valley has in place here. So mobile Sierra protects that. I think it also protects an agreement like this, where the purchasers, the distributors here have agreed to allow the Wabash Valley Board of Directors to devise the tariff and to... Okay, so I guess my question is whether the tariff itself here is a contract rate or not. I mean, whether it is or not, you know, the second clause of section 22 seems to suggest that, you know, there could be a unilateral change to the tariff. And it seems to me that partly what FERC is saying is that mobile Sierra doesn't apply to those changes because they're unilateral. Well, the... So even if the tariff itself was a contract rate. Yeah, I'm sorry. I said, even if the tariff was, you know, the formulary tariff was a contract rate, a unilateral change to that tariff would not be part of the contract rate. And so therefore not get the mobile Sierra presumption. I'm not sure that's FERC's rationale because they just basically say it's a tariff and mobile Sierra does not apply, period. But embedded in the idea of a tariff in all of the case law is the idea that you just expressed of the ability of the seller to unilaterally set the rate. That's what a tariff is. And that's lacking here because Wabash Valley's management cannot unilaterally change the rate. It's the board of directors controlled by the members and that's preserved in the contract. And that's an important distinction. In that, as Judge Silverman said at the beginning, in some sense puts the distribution on both sides of the contract, but it enables them to control the rate and through the board of directors that is charged to them and to contain the cost. So in that sense, it's not unilateral. It is part and parcel of their contractual agreement with Wabash Valley and by extension with each other to have this tariff be the rate that is in every contract. That's a feature and that's deliberate. Everybody wants to be charged the same rate and not be discriminated against. And by design, they have incorporated in each contract a common tariff. They could have written it into each contract, been more cumbersome. They've done it this way. And I don't think that makes a difference legally for mobile CR. But isn't it fair to say, going back to my point, that the distributors have somewhat less incentive to insist on the lowest price because they get the benefit economically of a higher price. So therefore, couldn't it be argued that the consumer is hurt then possibly by this arrangement? Because FERC can't use its normal standard of just and reasonable. Well, I would begin by saying that FERC accepted this cost-based tariff in 2005 as just and reasonable. And that's an important point that I want the court to know. That's not changing here. It's just a new set of contracts that are continuing to use the same existing cost-based tariff that FERC long ago approved. So FERC has already found that the consumers are protected by this cost-based rate. Well, we're talking about future changes. We're talking about future changes. Yes. But this entire enterprise, I mean, the members have boards of directors and they're controlled by consumers. And the Wabash Valley then is in turn controlled by the distributors, the risk board of directors. So this is a consumer-owned, consumer-governed enterprise. Well, it depends on who you're talking about as a consumer, not the house that buys electricity. But you've seen the point. Well, it's a two-level cooperative, a cooperative of cooperatives. What's the reason? May I ask you, what is the economic reason to set up this unusual structure? It's not unusual. There are 65 of these entities. They cover much of the country. Wabash Valley is very typical. Only about eight of them are regulated by FERC. Well, okay. What is the reason for it? The reason is economies of scale to build generation on their own or to acquire it through long-term wholesale power contracts. The Wabash Valley, it's a much larger enterprise than any of the small distributors. It has more bargaining leverage and more technical capabilities. It's just able to procure rates at a more competitive, lower cost than the individual distributors could on their own. They were set up mainly- Let me go back to Judge Katz's point. Although in the Morgan case, Justice Scalia said we could affirm on any grounds, we wouldn't have to remand. I still have- His point seems to me very powerful, that this is an arrangement which is really not contemplated by Mobile Sierra at all. It's an unusual situation compared with the hypotheticals that Mobile Sierra deals with. So therefore, why shouldn't we defer to FERC on this? Well, FERC, Mobile Sierra says that contracts freely negotiated are to be presumed to be just and reasonable. Under the Mobile Sierra doctrine and protected. The fact that this is not an investor-owned utility selling to 20 distributors does not change the fact that these are long-term contracts that are used by the distribution co-ops and the G&T that they're a member of for purposes of investment. I mean, a G&T cooperative goes into the capital markets to get loans in order to finance its generation purchases and its generation building. These are a large- They go to Wall Street for money. Protecting these long-term 50-year contracts is the lifeblood of a G&T cooperative. That's why the policy of Mobile Sierra would apply here even more strong than it would in the case of a bilateral power contract like in Morgan State. What prompted the WABOSH, the board of directors, to wish to add in the new contract the public interest standard rather than just and reasonable? To protect- Well, rather than, I shouldn't say rather than just and reasonable, rather than just and reasonable as implemented by FERC. Yes. To protect- To provide further protection of the contracts from either being modified by a single member who could file a complaint at FERC and say, and upset the whole apple cart for everyone. They don't want that to happen. And so all the members agreed not to do that. And it's to protect the integrity of the contracts. I mean, it's just- Mr. Elliott. Maybe a related question to what Judge Silverman just asked. I mean, can private parties change FERC standard of review by contract? I mean, so either Mobile Sierra applies because there's contract rate or it doesn't. But why does it matter what a private contract says about the standard that FERC should apply? Well, that is a good question. I mean, I think if Section 22, the second clause of Section 22 were not there, the contract would still be protected by Mobile Sierra because that is the default rule. So if the parties agree to a long-term contract and they waive their rights to change it during the term of the contract, that's Mobile Sierra. So then why does Wabash care? Why does Wabash care if this clause remains in the contracts? Well, it clarifies- I'm sorry. No, I mean, since FERC rejected the contracts without prejudice, why not resubmit the contracts without this clause? I mean, I guess just practically speaking, you know, what is so important about including this clause in the contracts? Yeah, well, given FERC's rationale in this order, and then they noted they've repeated it in a couple of other recent orders involving other distribution co-ops that have become newly regulated by FERC, like Wabash Valley, which has been regulated for years. FERC has essentially said the tariff- a G&T cooperative cannot adopt a common tariff that applies to all of its members, whether that is a stated rate, as in the tri-state case, or a formula rate, as in the case of Wabash Valley, and then have it protected as Mobile Sierra. And before this, the orders in these cases, I think Wabash Valley would have presumed that its formulary rate tariff was protected because it's part and parcel of their contract. Given FERC's order now rejecting these three words in the section 22, the implication seems to be that any member of Wabash Valley, or a third party who wants to cherry pick off some of the members of Wabash Valley, and come in and could attack the formulary rate tariff, and say that it's unjust and unreasonable, and that's not beyond the realm of contemplation. Can I interrupt for a moment? Really undermine the integrity. What do you mean, counsel, to say someone could pick off, cherry pick from outside? What are you talking about? A power marketer that would like to sell to one of the distribution cooperative members of Wabash Valley, could argue, could attempt to undermine the integrity of the entire enterprise by attacking the formulary rate tariff, saying that it's unjust and unreasonable because it excludes them, or it excludes, handcuffs the ability of one of the distributors to buy power from someone else. And I say that the rate is, that they've all agreed to, is unlawful, and unjust, and unreasonable. That essentially deprives the GNT and its members of the ability to protect their contractual, long-term contractual arrangement, including the rates. I mean, what about a consumer group? Could a consumer group attack this? Well, the purpose of the Mobile Sierra Clause, as clarified in the NRG power case, is to protect it from all comers. So including the non-contract parties. But if you did not have the public interest standard by contract, a consumer group would more easily be able to attack this as the standard just and reasonable calculation on the part of FERC. Yes, anyone could. Yes. Okay. Would the contract make a difference in that case? I mean, wouldn't FERC simply apply the standard FERC was going to apply? Like, could the contract change the standard that FERC applies? Well, Mobile Sierra does implicitly do that, yes. It says that FERC is required to presume that a contractually agreed-upon rating. No, no, I understand that. But the inclusion of a Mobile Sierra Clause, would that change? Yes. Yeah, well, I mean, the case law is that if the contract is silent, but it's a fixed rate for a long-term contract, Mobile Sierra applies to that contract by default. And so the rates agreed upon are protected by default. That's the case law now. Including a Mobile Sierra Clause clarifies, per adventure, what the rules are, I guess. Could I ask you about how the system worked under the old contracts? The old contracts, the members agree to rates established by the board, by the board of directors. But there's a very important caveat in that, which is, the revisions don't become effective unless and until FERC approves them. So FERC was doing, FERC has been reviewing these rates. Did they review them under the ordinary, just and reasonable standard, or under the public interest only standard? They reviewed them in 2005 when the formulary rate tariff was applied under the ordinary, just and reasonable standard. But the changes to the rates? I mean, the rate is the formula. And so Wabash Valley is not required annually to update that with a filing at FERC under Section 205. So the rate... Whenever they seek to change a rate, whether in 2005 or later, FERC reviewed that under the ordinary standard, correct? Yes, yes. Okay, so, I mean, if the antecedent arrangement was, board of directors sets the rate subject to ordinary, just and reasonable review, right, that's what Tipmont and all the other owners agreed to. And now Tipmont and all the other owners are having imposed on them the different standard of review over Tipmont's objection. Why isn't that an abrogation of the old contract? Well, the... You're imposing that on Tipmont without Tipmont's agreement. The procedure's not changed. The operative language of the contracts is the same, except for the Mobile Sierra Clause in Section 22. Everything else is the same. I think the 1977 contracts were written before Wabash Valley was regulated by FERC. And so they have a bit more general reference to regulatory authority. But when FERC was... When the contracts were filed and the formulary rate tariff in 2004, FERC said the 1977 contract allows FERC to review the formulary rate tariff and it's consistent with the contract. Under ordinary, just and reasonable standards. But... So that's like... I read the old contracts as effectively having a Memphis Clause. Right? The parties are preserving FERC's ability to review the rate under ordinary, just and reasonable standards. Well, the contracts then were silent as to the standard that applied. They explicitly said the rates don't become effective until FERC approves. And if you construe that to mean only that FERC reviews for just and reasonable... I'm sorry, for public interest, then A, that's not what actually happened based on what you told me. And B, that contract provision would do nothing since public interest review is a non-waivable feature of the statute anyway. Yes. Well, in 2004 and 5, when FERC... Before... This is before Morgan Stanley. FERC's position was that when a contract is first filed with them, they review it under the ordinary, just and reasonable standard. Morgan Stanley reversed that rule and said that the Mobile Sierra applies when... That FERC is required to apply the Morgan... When a contract is first filed. Unless the parties contract around that default rule. Yes. By the Memphis clause. Yeah. Well, FERC in the... As I recall, in the 2004 order where they accepted the formulary rate tariff and the contracts for filing, they dealt with this contractual language and said, which was contemplating state regulation of Wabash Valley in 1977, and said that it was consistent with section 205. And it enabled Wabash Valley to file the contracts, notwithstanding the reference to other regulatory authorities. And the... Suppose the old contracts had said the following, order directors gets to set the rate, but FERC gets to review the rates. And then it had one more step from the actual contract, which is it explicitly said, FERC's review is under ordinary, just and reasonable standards. If that was what the antecedent contracts had said, this amendment would be no good, correct? I mean, the parties have agreed to it, agreed to this amendment. And they didn't sign a contract. I mean, so that doesn't matter. The 20 members, 21 members agreed to it. Tipmont was given the opportunity to keep their existing contract and they did. So they're not made any worse off. They offered a better deal in Wabash Valley's view, and they turned it down. So there's... Right, you said earlier that the tariff rates, this arrangement is not severable by owner. The tariff rates are going to be what they're going to be. And they're going to apply to Tipmont, no less than to the 22 owners who approved the contract, right? That is correct. So all of the owners, whether they approve the new contract or not, are giving up their antecedent right to have FERC review the rates under an ordinary, just and reasonable standard. Well, I think they gave up that right when the contracts were filed at FERC under Morgan Stanley. Which contracts? Which contracts? I'm a little confused. The original contracts or the amended contracts? I believe Judge Katz's question was about the original. About the original, right. In other words, I understand your argument that the original contracts don't have a Memphis clause because they're silent on the standard of review. And we can debate that point. I'm just saying if they did have a Memphis clause, I don't see how the amended contract would be valid because it is imposing the new standard of review and therefore the new tariff rates on the objecting members. It's abrogating their antecedent contract, which includes the right to FERC review. So, assuming there was a Memphis clause in the original contracts, I think you may be correct. So, this ultimately comes down to how we should construe the original contracts, which on the one hand say FERC gets to review rates, but on the other hand is silent about standard of review. Yes, under Morgan. But of course, in these orders, FERC undertakes none of these examinations of fact-finding of any of the contractual relationships between the parties, either in 1977, 2006, or today. And so, FERC has made none of that kind of fact-finding inquiry and has not construed the original contracts. Fair enough, fair enough. But if we're construing Mobile Sierra rather than construing a discretionary decision by FERC, I'm not sure that matters. I would like to make sure I understand what the... I would like to make sure I understand that they extended the period of time. Isn't that correct? They do. And immediately extended the period of time and immediately applied a public interest standard. To, yes. To the existing contracts. No, to the new contracts. To the new contracts, which replaced the existing contracts. Yes, yes. Okay. So, the old contracts are null and void under your theories. Only to the signatories. I mean, there are two members who did not sign the new contracts. That's what I really want to focus on. The two members that didn't sign, therefore, have the benefit of the old contract, at least up to, what is it? 2050. 2050. So, they're perfectly fat and happy with the old contract up until 2050. They are bound by them. I don't know how... Tidmont, in other litigation, is attempting to terminate that contract. Oh, well, okay. Now, I'm really confused. Tidmont wants to terminate that contract?  In other litigation, they're attempting to do so before the 2050. Immediately. For what purpose? So, they can purchase from someone else. Yeah, that's what I thought. So, they have that option. Does that make them have bargaining power, in your view? Well, they have the option to buy out their existing contract. And the dispute between Wabash and Tidmont, which is in litigation at FERC right now, is the amount of the buyout and the period of the buyout. The notice period. And that gives Tidmont some bargaining leverage. Yes. In answer to your question. Interesting. But the important... A key thing that I think I don't want the court to lose sight of is that the formulary rate tariff is a cost-based rate, already approved by FERC. It's just and reasonable. It's going to apply to all the members under both sets of contracts. Let me ask again. What do you know is the position of Tidmont as to why they didn't want to agree to the modified contract? They didn't like the extended term. They didn't like some of the provisions that dealt with the respective rights and obligations of Wabash and the members to implement PURPA, to buy from qualifying facilities. They wanted to retain the ability to purchase from qualifying facilities, distributed generation. They wanted more liberal rules to allowing them to use local distributed generation rather than buying from Wabash Valley. But their challenge here is to the public interest standard. Well, yes. I mean, they've intervened in support of FERC here. But if you go look at their protest, pages 16 to 18 of their protest back in the joint appendix, you'll see they didn't raise any of the arguments that are in FERC's orders about section 22. In fact, they made a claim that the contracts, section five and 11, prevent them from filing any protest to the rates and deprive them of all rights. And that's clearly not the case because they retain the rights to file a complaint under the public interest standard. So they overplay their hand in their protest. They object to the contracts for many reasons, if you see in their protest in the joint appendix. But the argument that we're now having about the formulary rate tariff was not one of their arguments. And they've never protested the formulary rate tariff or sought to change it at FERC. So FERC's issue is completely separate. I'll have some questions for the intervener on that respect. Okay, Judge Silberman, anything else? No, no, sir. All right, thank you, Mr. Elliott. Thank you. Ms. Pacella, we'll hear from you. Good morning, your honors. Consistent with the Supreme Court's discourse and the commission's precedent, the commission reasonably rejected Wabash's proposal to require the commission to presume the justness and reasonableness of Wabash's tariff, not its contracts, its tariff, since its terms are not individually negotiated, but are set by Wabash's board of directors and apply generally. You're not suggesting that that term formulary tariff is inconsistent with a contract, are you? Yes, the commission found that the tariff is not a contract, your honor. No, they found that there was no contract here, but not because of the label of formula tariff. No, no, no, no, no, because the tariff is generally applicable and it is not individually negotiated between Wabash and the members. Here's my questions for you on that. Suppose two companies negotiate with, two distribution companies negotiate together with a power company. Is that, in your view, automatically a tariff because there's more than one company negotiating? No, if it's individual negotiation, if each of the members is actually part of that negotiation and is able to do, because listen, the underlying premise of Mobile Sierra, your honor, is that in wholesome markets- Wait, wait, wait, counsel, I'm just trying to understand your position before the argument. So if four companies would agree to bargain together with a powerful generator, that would be perfectly all right as a contract under Mobile Sierra? Yes, because that would have the arms-length bargaining, the parties with adversarial- Then why do you use this term individualized? It doesn't make any sense. It's individualized negotiation, your honor. So the point is that it has to be, each individual has to, who's going to end up- I'm sorry, your honor. I think Judge Silverman's hypothetical is two powerful owners make the structure we have here, which is they create a co-op, which has a board of directors, which negotiates or sets the rate. In other words, by the use of the word individualized negotiation, you don't mean it has to be a negotiation with just two companies. No, it means it can't be by majority vote, your honor. So the problem with the tariff being subject to Mobile Sierra presumption of justice and reasonableness is that you don't have what the underlying premise, and forgive me for going back to that, but I really think that that's the key to this case. The underlying premise of requiring the commission to apply the presumption of justice and reasonableness to contract is because in wholesale markets, the party charging the rate and the party charged are often sophisticated businesses enjoying presumptively equal bargaining power who could be expected to negotiate a just and reasonable rate as between the two of them. So that's where the commission's getting the individual language from is because it's between the two of them, but that can happen the same way if it's a room filled with everybody. If everybody's there and everybody doesn't just get an equal vote, but they can't be overruled by the majority that you have to have an individual negotiation. You have to be able to go head to head with your equal bargaining power. And that's not what occurs regarding the tariff here. So in this case, if you had the same structure, board of directors in which the provision was, we can't, we do not have a position with respect to the contract relating to the rates unless you have unanimous agreement, then you would say that's mobile Sierra. I think that the commission would find that part of the problem is solved for sure. I think, yes, arguably the commission would find that because you would know that these entities with equal bargaining power had the opportunity to get in there and actually negotiate something. And that's why you can presume it's just unreasonable. I see. So even if all the parties agreed in this case, the fact that the provision requiring majority vote would be objectionable to FERC, even if none of the members objected. That's right, Your Honor, because it's going forward. The board can change the rate going forward, right? And that's, again, that's fine. The board can change the rate going forward. The problem is you can't then presume. That is a very interesting response to my question. But why didn't FERC say that? FERC did say that. What the commission said in the orders was, first it said the Mobile Sierra public interest presumption applies only to rates set out in a freely negotiated wholesale energy contract. That's in paragraph 12 at JA 184. And then it explains thus to ascertain whether the instrument at issue is a freely negotiated contract. The commission determines whether it embodies an individualized contract. Counsel, FERC did not say the point that you made. Now, it may well be under Morgan, we can consider matters that FERC did not rely on. But they certainly didn't say what you just said, which I must say makes more sense than the FERC order. FERC never said the problem with this case is that you have majority vote in the amongst the members that could bind members who disagree like Tetna. I think that you can discern that from the commission's order, your honor. Forgive me. Let me point you to the hearing order at JA 223 paragraph 15, where the commission said, the Mobile Sierra presumption doesn't apply to this formulary rate tariff since it's generally applicable and it's not negotiated between Wabash and its executing members on an individualized basis. Rather, the Wabash board of directors determines the rates provided in the formulary rate tariff. And we know from the record that that means- You can stretch on that. Well, it's discernible. It's a very interesting point, counsel. Would Mobile Sierra apply to this set of contracts if the members had unanimously approved them? If the members had unanimously approved the provision regarding the tariff, because again, the commission's orders are only regarding the tariff, not regarding the contracts. The commission did not rule whether the contracts could have a Mobile Sierra presumption. If all of the members had agreed, I think not because the commission said it also is a generally applicable tariff. And that's the other part of the commission's holding it. It has two, there are two criteria, they're alternative. And one is that it's generally applicable. The other one is that it has to be individually negotiated. And so I think the tariff could apply to new members that join. And it's not hard. And as we pointed out in our brief, it's not hard to become a member of Wabash Valley. You really just have to apply and you agree by the bylaws and whatever other rules there are. So it's not difficult to become a member. It's not inconceivable. The petitioner says that's speculative, that you don't know how they would treat a new member. Well, we know that the tariff would apply to, the tariff applies to all Wabash members. That's conceded and that's a given. So anyone who's a member of Wabash Valley has to pay that tariff rate. And if it's subject to the public interest standard, that entity certainly hasn't agreed. And we know under NRG that this is gonna be applicable to third parties. So new members would have to pay a tariff rate, not have the ability to challenge it as not being ordinary, just a reasonable standard, but only could challenge it for purposes of- I don't understand the generally applicable as being a different point from the individualized notion. What do you mean? So the commission's point about that is that it would automatically apply to new members, not just, they weren't even there to potentially try to individually negotiate this because they weren't members at the time. But because the tariff automatically applies to all Wabash Valley members, that is a generally- That's really quite related to the question I was trying to get to in which Judge Katz has pointed out. If I understand the logic of your position, even if everybody agreed in this case, all the members, all the distributors agreed, you would say it's still the provision that allows majority rule to govern makes it inconsistent with an individualized, whether you're a strange use of the term individualized and therefore would not qualify under Mobile Sierra. Is that correct? That's right because- Whether or not anybody disagreed in this case. Yes, because if that tariff with the Mobile Sierra presumption of justice and reasonableness would apply to new members as well and they were not part of this negotiation. No, no, no, no, no. Even if there were no new members, your position is even if this didn't apply to new members at all, there was no question about that. You would say, if I understand you correctly, even if we only deal with the members that we have, the provision in the contract that requires majority rule is inconsistent with individualized negotiation. Yeah, that provision is on the contracts, Your Honor, it's in the bylaws, but yes, that provision makes it innately because it makes it innately inconsistent with being able to presume that entities with equal bargaining power got together and negotiated something. That's why we can presume that the rate is just and reasonable because when you have wholesale sophisticated entities doing that kind of bargaining, you can presume that they'd come out to a just and reasonable rate, but you can't presume that when not everybody actually gets their say in this negotiation. What do you make of the observation which Judge Cassis and I perhaps disagree as to the significance that in this case, the members are on both sides of the transaction? What do you make of that? For sure, the Supreme Court and this court's case law do talk about the importance of arm's length negotiations and arm's length negotiations have to be between adversarial parties with different interests. And I think that arguably, not even arguably, I mean, these are all member owner customers. So they are both buyers and sellers here and they have a common interest. This is or not arm's length. But that's really, I think more towards the, well, maybe not. It is a tariff question too. I know that the intervener Titmon talks about either in the record or in their appellate brief, talks about how not every member has the same purchasing. They some buy more than other entities within Wabash Valley. And so even though each member gets an individual vote, some parties might be more interested in trying to get a rate higher, set higher than someone else because these are also competing entities. So it's kind of an interesting quagmire there. So the one equal vote, it's not really based on how much you actually purchased through Wabash Valley. And I'm sorry, Mr. Elliott, please correct me if I'm not correct about that. I think it is important to recognize that does get, while we don't get deference in interpreting the Supreme Court's case law, we do get deference in applying that case law to these facts. And what the commission found here is in this unusual circumstance, this is not a typical Mobile Sierra provision in a contract. This provision not only binds the commission and others to public interest review regarding the contract itself, but also regarding the tariff. And that is unusual. That is not a typical circumstance. And it is extreme. And it's not the type of, this is a tariff, is not the type of contract that Mobile Sierra is intended to apply to. It's not a contract. This is an, even though it's not unilaterally set the tariff rates by Wabash staff members, it is unilaterally set by Wabash's board of directors. And that is not something to which Mobile Sierra can apply. Ms. Bassoli, if I could just ask you a question. I also asked Mr. Elliott, I mean, can parties change FERC's standard of review by contract? I think if they, Your Honor, I think if they can by including a Memphis clause in the contract, right, with Mobile Sierra being the default. And again, it has to be a contract first for that to apply. Mobile Sierra presumption only applies to contracts. But so I think in that way, they can change the standard of review. But can they, I mean, can they require FERC to apply the Mobile Sierra presumption to things that FERC determines are not contract rates? Absolutely not, Your Honor. Mobile Sierra presumption only applies to contract rates. And again, it's based on that underlying presumption that you can presume rates are just reasonable because this head-to-head negotiation occurred. You know, I have a question about that footnote in the FERC opinion that they don't reach the Mobile Sierra question at all. Well, I found that a little puzzling because don't you have to answer the question, discuss the premise of Mobile Sierra, whether this is a contract or a tariff? And in considering that, you have to consider whether or not there's arm's length bargaining between roughly equal parties with equal bargaining power. Isn't that right? So it's a little artificial to say, as FERC says, we don't even reach the Mobile Sierra question because they have to consider the premise of Mobile Sierra, whether this is a contract or a tariff. Sure. What the footnote in each order that you're referring to, Your Honor, says that what it says is the commission didn't reach whether the contracts are subject to Mobile Sierra presumption, whether that's OK or not. What the commission's whole orders are about is whether the tariff is subject to the Mobile Sierra presumption. So the whole point of these orders is about Mobile Sierra and applying Mobile Sierra cases. So I was overreading the footnote. Yes, Your Honor. I see how you're dividing that, but it's almost, again, almost metaphysical. Well, no, the point is, FERC is saying, FERC, you know, it addressed the big issue here, which was, can you apply Mobile Sierra to something that's not a contract rate? It's a tariff. So we... Well, that's true. The problem with that, it assumes the conclusion. No, no, the commission's point, that's what it addressed in. It didn't assume the conclusion. The commission determined that it's not a contract rate because it's generally, you can't, the underlying assumption doesn't work in a circumstance where you have the board of directors making the determination what the rates are going to be. Okay. I understand it. The key to your whole case is the provision requiring each member to comply with the majority vote of the board of directors. That's the key to your case. Yes, is that the board of directors does it and as the record reflects, that is by majority vote. Yes. And that is what the commission said in paragraph 15 of JA 2223. These are not negotiated on an individualized basis. The tariff is not the tariff rate because the board of directors determined the rates in the formulary rate tariff. Again, there's no problem. The commission's not saying you can't have the tariff rate be the contract rate. And the commission's not saying that can't change over time. The commission's not saying that here. The commission's just saying you can't require the commission to presume that that will then be just and reasonable because this is not a negotiated rate. So your view would be entirely different if the bylaws required unanimity. Yes, that would be a completely different circumstance, your honor. What one you would treat as a contract under Mobile Sierra. I think I was saying before, the commission also found that it's generally applicable. The tariff is generally applicable. So I think there's that wrinkle there. Again, when you look at the way the commission determines when it explains in paragraph 14 at J222 to 223, when it determines whether Mobile Sierra presumption can apply to an instrument, it looks at in the second. Well, wait a minute, wait a minute. Let's talk about the generally applicable. If any, if under the bylaws, you had to have unanimity and other members could be brought in and they would have the same benefit. It had to be unanimous. So if new members would have it, OK, I see what you're saying, your honor. So it's generally applicable, but everybody gets that actual vote that those entities themselves will have an opportunity to determine the rate. That's a circumstance that wasn't before the commission. So it's hard for me to speak for sure. I guess there would be some period of time before the year. We don't know how often the board is changing the rate. There's some period of time where these new entities would be subject to that tariff rate without being able to challenge it, except under the presumption of justice and reasonableness. So, well, no, they wouldn't know by contract, they wouldn't be bound unless they agreed. Under my hypothetical. So in that circumstance, I think the commission would not have an issue with that. I think the commission would find that the underlying premise of having of the Mobile Sierra presumption of assuming that something is just and reasonable would be satisfied in that circumstance. Thank you. If so, anything else? No, thank you. Thank you, Your Honor. Mr. Elliott, we'll give you two minutes. Thank you, Your Honor. As a primary matter, just to clarify one point that Ms. Pacella raised, and that is that is a one member, one vote rule in the board of directors at Wabash Valley. Each member has an equal vote. And that's true, not just in Wabash Valley, but every cooperative in America that I'm aware of. The focus on that point of the democratic governance of the cooperative and how that is somehow inconsistent with Mobile Sierra is a dramatic extension of the Mobile Sierra doctrine that I don't know there's any basis in any case law anywhere. The case law in Mobile Sierra. Well, this is a- Can you point to- Oh, excuse me. Go ahead, please. Okay, sorry. Can you point to any case where FERC has applied the presumption to a cooperative with a similar structure to Wabash's? Since you said those is a pretty common structure. Yes, but there are only about eight by my count cooperatives who are regulated by FERC. Most of them are not regulated by FERC statutorily. So there are only a handful of them. And this issue has not come up very often. There was a case involving Old Dominion Cooperative that I think is referred to in some of the orders cited in the FERC orders here that applied a Mobile Sierra presumption to a member's long-term contract, all requirements contract. But a tariff, like we're talking about here, has never come up. And FERC's involvement is sporadic because many of these arrangements involve intrastate transactions? Well, they're just statutorily exempt because a lot of cooperatives are borrowers from the Rural Utility Service, a federal agency, and statutorily are exempt. So Wabash Valley is not, and there are a handful who are not. OK, so they're regulated by FERC. Important point that I think FERC Council has emphasized here is that the FERC orders presume, do not reach the question whether these contracts were freely negotiated at arm's length. They presume they were and reject this Mobile Sierra clause even if they were. So there could have been unanimity, free of the perfect contracts, perfectly negotiated. FERC's rule is that you can't do it this way. You cannot protect the mutually agreed upon contract rate through a common tariff controlled by the Board of Directors. We've had a wide-ranging discussion today about the negotiating power and the bargaining leverage and none of that is in the FERC orders, of course. So I think there's really no question you have to remand this for a more searching examination of the real issues by the Commission because this Delphic one-paragraph explanation is just completely inadequate to constitute reasoned decision-making. So I would leave you with that point that I think the orders here are just completely deficient as a matter of reasoned decision-making. They haven't grappled with the real issues of why Mobile Sierra should apply or not to this arrangement. Any other questions from the panel? Thank you, Mr. Elliott. The case is submitted.
judges: Katsas, Rao, Silberman